BARRY J. PORTMAN
Federal Public Defender
NED SMOCK
Assistant Federal Public Defender
555 - 12th Street
Suite 650
Oakland, CA 94607-3627
Telephone: (510) 637-3500

Counsel for Defendant Thayer

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-07-812 DLJ |
| | ) | |
| Plaintiff, | ) | **Defendant's Appeal of Magistrate's Pre-Trial Detention Order** |
| | ) | |
| vs. | ) | |
| | ) | Date:   August 15, 2008 |
| RANDALL THAYER | ) | Time:   9:00 a.m. |
| | ) | Court: Hon. D. Lowell Jensen |
| Defendant. | ) | |
| | ) | |

**I.     Introduction**

        The defense seeks review of Magistrate Judge Wayne D. Brazil's order denying pre-trial

release of Randall Thayer.  Mr. Thayer has no criminal history, will abide by strict conditions of

release including GPS monitoring and home detention, and can post his home as collateral.  He

poses neither a risk of flight or a danger to the community.  He should be released from custody,

just as most defendants charged with child pornography offenses in this District are.

## II.    Procedural History

On December 20, 2007, Randall Thayer was named in an indictment charging two counts of violating 18 U.S.C. § 2252(a)(1), Transportation of Child Pornography, and one count of violating 18 U.S.C. § 2252(a)(4)(B), Possession of Child Pornography.  Mr. Thayer first appeared before Magistrate Judge Brazil on January 14, 2008.  On February 8, 2008, a detention hearing was held, at which the defense proposed release conditions including Global Positioning System monitoring and home detention allowing only that Mr. Thayer go to and from work. Judge Brazil issued an order detaining Mr. Thayer following the hearing.  The decision ordering Mr. Thayer detained is attached hereto at Exhibit A.[1]  Magistrate Judge Brazil based his order of detention on a finding that Mr. Thayer was a danger to the community.  He cited three sources of concern:  (1) the nature of the charges against Mr. Thayer; (2) Mr. Thayer's admission to occasional use of cocaine and methamphetamine; and (3) what Magistrate Judge Brazil perceived to be lies by Mr. Thayer in conversations with the investigating agents and United States Pretrial Services.  On March 21, 2008, the defense sought reconsideration of Judge Brazil's decision based upon additional facts and argument not previously presented to the magistrate court.  That motion for reconsideration was denied.

## III.    Legal Standard

A district court's review of a magistrate's detention order is to be conducted without deference to the magistrate's factual findings.  *United States v. Koenig*, 912 F.2d 1190, 1192-1193 (9th Cir. 1990)("[The district court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference.").

In non-capital cases, pre-trial release is the norm and should be denied only in rare circumstances.  *See United States v.  Motamedi*, 767 F.2d 1403, 1405 (9th Cir.  1985).  It is a

---

[1] The defense will also hand-deliver to the Court and to the government an audio recording of all detention proceedings.

1    corollary to the presumption of innocence that "the right to bail should be denied only for the

2    strongest reasons." *Id.* at 1407.   Pre-trial detention also implicates the constitutional protections

3    against the denial of liberty without due process and against excessive bail.  U.S. Const. amends.

4    V, VIII.  The Bail Reform Act of 1984 mandates release of a person facing trial under the least

5    restrictive conditions or combination of conditions that will reasonably assure the person's

6    appearance. *See Motamedi*, 767 F.2d at 1405.  "Doubts regarding the propriety of release should

7    be resolved in favor of the defendant." *Id.*  A defendant must be released if conditions can

8    "reasonably ensure" the appearance of the person as required and the safety of any other person

9    and the community.  18 U.S.C. § 3142(e).

10        The Bail Reform Act establishes a rebuttable presumption in cases charging violation of

11   18 U.S.C. § 2252(a)(1) that no combination of conditions will reasonably assure the appearance

12   of the person and the safety of the community.  18 U.S.C. § 3142(e).  In a presumption case such

13   as this, a defendant bears a limited burden of production - not a burden of persuasion - to rebut

14   that presumption by producing some credible evidence indicating that he does not pose a danger

15   to the community or a risk of flight.  *See United States v. Chen*, 820 F.Supp. 1205, 1207 (N.D.

16   Cal. 1992).  Although the presumption shifts a burden of production to the defendant, the burden

17   of persuasion remains with the government. *See United States v. Rodriguez,* 950 F.2d 85, 88 (2d

18   Cir.1991).  A finding that a defendant is a danger to any other person or the community must be

19   supported by "clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B).

20        Once the presumption is rebutted, the government must prove by clear and convincing

21   evidence that no combination of conditions can reasonably assure the defendant's appearance and

22   the safety of the community.  *Chen*, 820 F.Supp. at 1208.  The government may not rely solely on

23   the indictment to justify detention.  *Id.*  The statute sets out four factors a court must consider: (1)

24   the nature and circumstances of the offense charged, including whether the offense is a federal

25   crime of terrorism; (2) the weight of the evidence against the person; (3) the history and

26   characteristics of the person, including the person's character, physical and mental condition,

1  family and community ties, employment, financial resources, past criminal conduct, and history

2  relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person

3  or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

4  **IV.    Argument**

5       Here, the defense proffered more than enough evidence to convincingly overcome the

6  presumption of risk of flight or dangerousness. Randall Thayer has no criminal record. He has a

7  lengthy and steady employment history. Before his arrest, he had worked for several years at Sun

8  Microsystems. He has strong family ties to the East Bay - at the time of his arrest he was living

9  with his father, his son, and his girlfriend in a home in Oakland. Even while incarcerated at the

10  Alameda County Jail, he has continued to be in close contact with his family.

11       Mr. Thayer has proven that he can be trusted to appear in Court whenever ordered. The

12  search of Mr. Thayer's home occurred several months before his ultimate arrest. The search

13  occurred on April 3, 2007. When agents arrived at Mr. Thayer's home to perform the search,

14  they informed him that he was the target of an investigation regarding his possession and

15  distribution of child pornography. As the agents performed their search, Mr. Thayer was allowed

16  to leave the home to take a laptop computer to his son's school. Mr. Thayer then drove on his

17  own to the Oakland FBI office to voluntarily undergo a polygraph examination. Moreover, Mr.

18  Thayer remained at home and did not seek to evade law enforcement in the several months after

19  the search was performed even though he was well aware he faced an imminent indictment. Mr.

20  Thayer was still living at the same home when law enforcement came to arrest him on January

21  14, 2008, nine months after the search. He was on his way to work when agents arrived at his

22  home to arrest him. Agents simply called him on his cellular telephone and asked him to return

23  home. Instead of absconding, Mr. Thayer obediently turned his car around and returned home to

24  surrender himself to the agents.

25

26

**V.    The Statutory Factors in 18 U.S.C. §3142(g) Favor Release on Conditions**

Further, close analysis of the four statutory factors in 18 U.S.C. § 3142(g) establishes that release is appropriate.

**a.    18 U.S.C. § 3142(g)(1) - Nature and Circumstances of Offense Charged**

The charge in this case is that Mr. Thayer viewed and exchanged images of child pornography on the internet.  Magistrate Judge Brazil placed emphasis on the fact that the indictment charged conduct in March of 2006 and April of 2007.  According to Magistrate Judge Brazil, the eleven month period between the two counts suggested that the conduct was not isolated or aberrational.   Magistrate Judge Brazil also noted that agents claimed that some images included depictions of what they described as "sadistic penetration" of pre-pubescent boys and girls.  However, it was not clarified how or why the images allegedly found in Mr. Thayer's home were any more violent or reprehensible than those in other child pornography cases in this District in which the defendant has been released from custody pending trial.  No meaningful link was developed between the nature of the images described in this case and some unique threat to the community posed by Mr. Thayer.  It goes without saying that any individual with a significant number of images of child pornography will have specific images in their computer that can be cited as particularly shocking.  In these cases the government will always be able to describe images and video that are horrific to the average citizen.  What is missing is some evidence that these images make Mr. Thayer somehow particularly dangerous in comparison to other defendants facing similar charges.

**b.    18 U.S.C. § 3142(g)(2) - Weight of the Evidence Against the Defendant**

"The weight of the evidence is the least important of the various factors." *Motamedi,* 767 F.2d at 1408 (explaining that "the statute neither requires nor permits a pretrial determination that a person is guilty").  Even assuming that the government can prove that Mr. Thayer possessed child pornography, he remains a good candidate for release.

### c.    18 U.S.C. § 3142(g)(3) - Defendant's History and Characteristics

Until this case, Mr. Thayer has led a completely law abiding life. He has worked steadily and is the devoted father of an 18 year old son, who now visits him at the jail regularly. He owns a home in Oakland, in which he lived with his father, his girlfriend, and his son. Mr. Thayer is seeking release from custody so that he can spend time with his family and arrange his financial affairs. Mr. Thayer was arrested without warning, and would at a minimum like to have time, however limited, to make financial and family arrangements in light of the fact that he is facing a possible term of incarceration. In addition, he would like to marry his girlfriend.

### d.    18 U.S.C. § 3142(g)(4) - The Nature and Seriousness of the Danger to the Community That Would be Posed by the Defendant's Release

Mr. Thayer does not pose a danger to the community. Even were one to assume otherwise, conditions can be crafted to assure that Mr. Thayer has no opportunity to engage in illegal conduct. Specifically, Mr. Thayer is willing to be subject to GPS monitoring and strict home detention. He understands that there would be no computers allowed in his home and that he would be completely barred from accessing computers. He will also agree to terms that prohibit contact with minors or venturing near locations where minors typically congregate. To the extent the court is concerned about drug use, he will submit to regular urinalysis. Comparable conditions are imposed on a significant number of defendants charged with similar offenses in this District. Under these circumstances, it is difficult to imagine how Mr. Thayer could pose a threat to the community.

At the February 8 detention hearing, the government informed the Court that two pairs of boy's underwear were found in a drawer in Mr. Thayer's bedroom along with videocassettes, and suggested that this was evidence of Mr. Thayer's danger to the community. Magistrate Judge Brazil cited this fact in his opinion ordering detention. Further inquiry, though, shows that this is a red herring. First, the videotapes in the drawer are innocuous and do not contain child pornography. Second, Mr. Thayer's son, Alex, has examined a picture of the underwear and

1   maintains without equivocation that they were his.  Defense counsel informed Magistrate Judge

2   Brazil that Alex was prepared to testify under oath about this, but Magistrate Judge Brazil

3   declined to hear his testimony.

4         Judge Brazil also noted that Mr. Thayer had communicated over the internet with an

5   undercover federal agent and that during one of those online conversations, Mr. Thayer reported

6   that in the past he had masturbated into a pair of underwear belonging to his girlfriend's daughter

7   as he watched her sleeping.  It is extremely important to note the context of this online

8   conversation.[2]  Mr. Thayer was conversing through his computer with an individual he had never

9   seen or communicated with before.  Neither Mr. Thayer or the undercover agent were identified

10  by their true names during the conversation.  Conversation in online chatrooms centered on

11  sexual conduct frequently amount to accounts of fantasy that are framed as reality.  Indeed, the

12  person identified as Mr. Thayer provides details about himself that are demonstrably false,

13  showing that the entire conversation amounted to fantasy, rather than a discussion of true

14  conduct.  The government has never put forth evidence that Mr. Thayer ever had a girlfriend with

15  a 12-year old daughter.  He did not.  Moreover, were there an actual victim in this case, the

16  government would have uncovered one during its lengthy investigation.

17        The government contends that Mr. Thayer must be detained as a danger to the community

18  despite the fact that Mr. Thayer was left out of custody without supervision for almost one year

19  after allegedly admitting to downloading and possessing child pornography.  Mr. Thayer was out

20  of custody between the April 2007 search of his home and his arrest in January of 2008.  There

21  has been no suggestion that Mr. Thayer sought out child pornography or engaged in any unlawful

22  conduct during that lengthy period.  He would continue to abide by the law were he released

23  from custody at this point.

24

25  _____

26        [2]The defense will assume, for the purposes of this argument, that the individual involved
    in these communications was Mr. Thayer.

Defendant's Detention Appeal                  7

**VI.    Factors Relied Upon by Magistrate Judge Brazil Do Not Establish that No Acceptable Release Conditions Can be Crafted**

Magistrate Judge Brazil determined that there were no terms and conditions on which Mr. Thayer could be released that would reasonably assure the safety of the community.  That decision was premised on an erroneous finding that Mr. Thayer had been intentionally dishonest on a number of occasions.  Each of the alleged acts of dishonesty will be addressed in turn.

**a.    Drug Use**

Magistrate Judge Brazil was troubled by the fact that Mr. Thayer initially denied drug use during the past 30 years during his interview with the Pretrial Services officer.  While it is true that Mr. Thayer made the mistake of falsely representing that he had not used drugs recently, he did so under extremely unusual circumstances.  When a search of Mr. Thayer's home was performed in April of 2007, agents found very small amounts of methamphetamine and cocaine at his house.  The agents acknowledge in a written report that they spoke with Mr. Thayer about the drugs and that the drugs were flushed down the toilet.  Mr. Thayer recalls that the officers told him that it was his choice about what to do with the drugs - they could call the Oakland Police Department, or he could flush the drugs down the toilet.  The impression he got was that the officers were encouraging him to enter into a mutual pact of silence about the drugs - namely that if he didn't say anything about the small amount of drugs, they wouldn't say anything, and he would not face prosecution for possessing them.  It was in this unusual and confusing context that Mr. Thayer was asked by the Pretrial Services officer about drug use.  He later acknowledged that he had, in fact, used drugs on a handful of occasions before the April search.  Mr. Thayer does not, however, have a significant drug problem.  He will participate in regular drug testing upon his release, and recognizes that drug use while on pretrial release would likely result in his re-incarceration.

**b.    Mr. Thayer's Failure to Mention His Adult Son and His Interest in Undeveloped Land in Arizona**

Magistrate Judge Brazil also relied upon the fact that Mr. Thayer did not initially disclose

1    to Pretrial Services that he has an adult son and that he has an equitable interest in an

2    undeveloped piece of property in Arizona.  Neither of these issues are significant, and neither

3    arise because of intentional dishonesty on Mr. Thayer's part.  First, Mr. Thayer has two sons.

4    His younger son, Alex, lived with him until his arrest.  Mr. Thayer also has an older son with

5    whom he is not in contact.  When he was asked about children, Mr. Thayer only mentioned Alex

6    because he was a minor at the time and because Alex was living with him.  Mr. Thayer's older

7    son is 23 years old and lives in Indiana.  They have not been in contact in ten years.

8         With respect to the land in Arizona, Mr. Thayer has a small interest in a piece of

9    undeveloped land in the desert in Arizona.  There are no roads, power, or water on the property.

10   The property is in his brother's name.  There may have been a question asked during the Pretrial

11   interview that should have triggered Mr. Thayer's memory about that property, but the property

12   is almost worthless and not something Mr. Thayer has in the front of his mind.  Mr. Thayer

13   otherwise gave Pretrial Services detailed information about his other property.  He told them

14   about his homes in Oakland and in Richmond.  The Richmond home is now in foreclosure.  He

15   also told Pretrial Services about his truck and his motorcycle.  The property that he told Pretrial

16   Services about, his own home, is his most significant asset.  There could be absolutely no benefit

17   to Mr. Thayer to be gained from hiding the existence of his older son or the small interest he has

18   in a low-value patch of land in Arizona.  They were simply oversights by a man engaged in a

19   brief custodial interview with a Pretrial Services officer at a time when he was under a great deal

20   of stress.

21        c.    **Lie Detector Results**

22        Mr. Thayer was subjected to a polygraph test by law enforcement after the April search,

23   during which he was asked questions about whether he had ever had sexual contact with a child.

24   According to the examiner, Mr. Thayer was untruthful when he denied having engaged in such

25   conduct.  Magistrate Judge Brazil relied upon this reported test result in his decision: "A matter

26   of more direct and obvious consequence is Mr. Thayer's apparent failure to answer truthfully a

1  very pertinent question that agents posed to him last April during a polygraph examination."

2  Detention Order at 3, ln. 14. Most importantly, Magistrate Judge Brazil appears to assume

3  based upon this lie detector test that Mr. Thayer has, in fact, molested a minor in the past. Not

4  even the most devoted lie detector adherents claim that a finding of dishonesty in answer to a

5  question on a polygraph conclusively establishes some allegation to be true. The most that can

6  be said is that the question and answer produce some level of discomfort in the person being

7  tested. Nevertheless, Magistrate Judge Brazil concluded that Mr. Thayer lied about whether he

8  has ever molested a minor. *Id.* at 4, ln.1-4. This was a serious error. Mr. Thayer strongly denies

9  ever having touched a minor inappropriately.

10  While the Ninth Circuit does not have a per se rule barring the admission of polygraph

11  results, the Court bars their presentation to juries. *United States v. Cordoba*, 194 F.3d 1053 (9th

12  Cir. 1999) (noting that there is no known error rate for real-life polygraph exams). Among the

13  reasons for this is that there are serious questions about the reliability of the test. The lower court

14  in *Cordoba* noted that:

15      Eleven studies of polygraph evidence showed a wide range of accuracy rates-from
    48% to 90%-with an average rate of 71%. Two critics have maintained the CQT
16      approach is little better than "the toss of a coin." W. Iacono & D. Lykken, *The
    Scientific Status of Research on Polygraph Techniques: The Case Against
17      Polygraph Tests, supra,* at 629. In the view of the OTA, "[o]verall, the cumulative
    research evidence suggests that when used in criminal investigations, the
18      polygraph test detects deception better than chance, but with error rates that could
    be considered significant."
19

20  *United States v. Cordoba*, 991 F.Supp. 1199, 1203 (C.D.Cal.1998) (internal citations omitted).

21  Indeed, in *Cordoba*, the government argued that polygraph exams <u>do not</u> meet the reliability

22  standards established in *Daubert.* The Department of Justice should not move to exclude

23  polygraph evidence offered by a defendant at trial, but seek to use the same unproven testing

24  method to justify detaining another defendant.

25  Polygraph testing is most often used by law enforcement as an interrogation tool aimed at

26  eliciting inculpatory statements. Officers subject a suspect to a lie detector test in hopes of

getting them to "come clean" after they have been told that their initial story was shown to be "indicative of deception." The test is by no means a proven method of establishing whether a particular event actually occurred. Indeed, the most that can be said based upon the polygraph test of Mr. Thayer is that a question about whether he had ever touched a child for sexual gratification generated a reaction in Mr. Thayer like an increased heart rate, perspiration, or quickened breathing. According to the National Academy of Sciences, "a variety of mental and physical factors, such as anxiety about being tested, can affect polygraph results - making the technique susceptible to error." *The Polygraph and Lie Detection* (National Academies Press, 2002). This is no basis to detain a person, and certainly no basis for concluding that Mr. Thayer has molested a minor. Again, Mr. Thayer vehemently denies this allegation, and the government has not identified anyone Mr. Thayer is alleged to have touched inappropriately.

The government's burden is to establish danger to the community by clear and convincing evidence. A polygraph test is of no help in meeting this burden. The additional factors relied upon by the government do not withstand scrutiny, either. Any legitimate concerns can be addressed by the restrictive proposed conditions of release.

**VII.    Conclusion**

There is no meaningful difference between Mr. Thayer's case and that of the countless other defendants facing similar charges who are released from custody under the stringent conditions established by the Adam Walsh Act. Some of the factors relied upon by Magistrate Judge Brazil to detain Mr. Thayer are not supported by credible evidence, some are the results of misunderstandings, and some are simply wrong. Mr. Thayer has no criminal record, a long employment history, and can post a significant bond. He seeks release so that he can get his

//

//

//

//

financial and personal affairs in order. The defense has proposed a restrictive combination of conditions that should assure the Court that there will be no threat to the community. Of course, Mr. Thayer is willing to abide by whatever additional conditions this Court may wish to impose. Under these circumstances, Mr. Thayer should be released from custody.

Dated: August 1, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

/s/ Ned Smock

NED SMOCK
Assistant Federal Public Defender