United States District Court
For the Northern District of California

UNITED STATES OF AMERICA,    )
                             )
             Plaintiff,   )
                             )
       v.              )
                             )    No.  CR-07-812-DLJ
                             )
                             )    **ORDER**
RANDALL ALAN THAYER,      )
                             )
             Defendant.  )
_____)

On October 17, 2008, defendant Randall Alan Thayer ("Thayer") filed a motion to suppress evidence seized pursuant to a search warrant.

The Court heard oral argument and conducted an evidentiary hearing on November 14, 2008.  Ned Smock appeared on behalf of Thayer.  Chinhayi Coleman appeared for the government.  On November 17, 2008, the government submitted additional evidence for the Court's review.  On November 21, 2008, Thayer filed a post-hearing notice.

Having considered the arguments of counsel, the papers submitted, the applicable law, and the record in this case, the Court hereby DENIES the motion.

## I.   BACKGROUND

**A.     Factual Background**

Thayer is charged in an indictment with transportation and possession of child pornography.  On March 30, 2007, FBI Special Agent Denise G. Gaztambide ("Gaztambide") executed an affidavit in support of a warrant application to search Thayer's home at 3533

Mirasol Avenue, Oakland, California, 94605.  In the affidavit, Gaztambide set forth a "Summary of Probable Cause to Search Items." Gaztambide obtained the majority of the information contained in the alleged statement of probable cause from other FBI agents conducting child pornography investigations across the country. One such investigation took place in Philadelphia, another in Buffalo, and a third in Pittsburgh.

**1.   Philadelphia Investigation**

In Philadelphia, the FBI investigated a suspect named Robert Hughes ("Hughes") for child pornography.  A forensic analysis of Hughes's computer revealed that Hughes received four emails attaching child pornography from an America Online ("AOL") user named "Rodrigooak3530."  According to the affidavit, "Rodrigooak3530" sent three of the four emails on March 22, 2006. The affidavit did not identify the date on which the fourth email was sent.

On February 1, 2007, in response to a government subpoena, AOL provided records indicating that the screen name "Rodrigooak3530" was registered to an account holder named Eneida Mendoza, at 449 Tyrella Avenue, Mountain View, California.  As of February 1, 2007, the account was billed to a credit card owned by Thayer.

**2.   Buffalo Investigation**

In Buffalo, the FBI investigated a suspect named Bruce Bemer

2

**United States District Court**
For the Northern District of California

("Bemer").  Bemer identified "Rodrigooak3530" as a person with whom he frequently traded child pornography.  On March 31, 2006, in response to a search warrant, AOL revealed that Bemer had sent twelve child pornographic images to "Rodrigooak3530." "Rodrigooak3530" had sent seventeen child pornographic images to Bemer.

The investigating agents in Buffalo conducted undercover online communications with "Rodrigooak3530."  On March 24, 2006, the undercover agents received an email from "Rodrigooak3530" attaching an image of child pornography.  On April 26, 2006, the undercover agents initiated an online conversation with "Rodrigooak3530."  On that occasion, "Rodrigooak3530" emailed the agents a child pornographic video and several pictures of child pornography.

On April 25, 2006, in response to a government subpoena, AOL provided documents which revealed that, as of April 25, the account associated with "Rodrigooak3530" belonged to Eneida Mendoza, 449 Tyrella Avenue, Mountain View, California, and was billed to the credit card of Eneida Mendoza.

On May 12, 2006, in response to a government subpoena, AT&T Internet Services provided Internet Protocol ("IP") information for the two dates and times on which "Rodrigooak3530" transmitted child pornography to the undercover agents in Buffalo.  The AT&T information revealed that both times "Rodrigooak3530" transmitted

3

child pornography, the person using the "Rodrigooak3530" screen name was physically located at Thayer's home, 3533 Mirasol Avenue, Oakland, California, 94605. The name on the AT&T account was "Randall Randall." The phone number was 510-562-8834. The billing start date for the account was October 2, 2005.

### 3. Pittsburgh Investigation

In Pittsburgh, the FBI investigated a suspect named Robb Dieringer ("Dieringer"). A forensic analysis of Dieringer's computers revealed that on September 2, 2006, Dieringer sent four child pornographic images to "Rodrigooak3530."

In response to a government subpoena, AOL provided documents which revealed that the account associated with "Rodrigooak3530" belonged to Eneida Mendoza, 449 Tyrella Avenue, Mountain View, California, and was billed to a Visa card owned by Thayer. Gaztambide's affidavit did not specify the date on which AOL issued the Pittsburgh records.

### 4. Additional Information Provided in the Affidavit

The affidavit also contained a section entitled "Child Pornography Collector Characteristics." In this section, Gaztambide opined that "[c]hild pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location where it is readily available." Gaztambide stated that collectors rarely, if ever, dispose of their collections. Gaztambide claimed that

4

although a collection may be refined over time, the size of the collection tends to increase because child pornography collectors "treat the materials as prized possessions and are especially unlikely to part with them."

Last, the affidavit contained a section entitled "Background on Computers and Child Pornography." In this section, Gaztambide stated that even if a collector disposes of his or her child pornographic materials, "forensic experts are nonetheless often able to recover the pornographic images that were purposefully possessed at some previous time from the computer's 'unallocated' or 'slack' space," or from the temporary internet files of the computer.

### 5. Execution of the Search Warrant

On March 30, 2007, United States Magistrate Judge Joseph C. Spero signed a search warrant authorizing a search of 3533 Mirasol Avenue. In signing the warrant, Judge Spero crossed out a clause which would have allowed the FBI to conduct a search "at any time in the day or night." In so doing, Judge Spero restricted the authorized period for searching to the daytime hours from 6:00 a.m. to 10:00 p.m.

On April 3, 2007, pursuant to the warrant, an FBI team led by Gaztambide conducted a search of Thayer's home. As a result of the search, the government obtained electronic and testimonial evidence incriminating Thayer in the transportation and possession of child

5

pornography.

Thayer and the government disagree regarding the time at which the FBI conducted the search.  Thayer claims the agents entered his home prior to 6:00 a.m.  In support of this claim, Thayer submitted the declarations of Alexander Thayer ("Alexander") and Ronald Thayer ("Ronald").  Alexander, Randall Thayer's son, declared as follows: that (1) he was asleep on the couch when the agents arrived; (2) he made a phone call to a friend approximately twenty minutes after the agents arrived; and (3) his telephone records indicate that he made the call at 6:05 a.m.

Ronald, Randall Thayer's father, declared as follows: that (1) he normally wakes up around 5:00 a.m.; (2) he was still asleep when the agents arrived; (3) the FBI took a photo which included his wristwatch; (4) in that photo, the face of his watch read 6:02; and (5) Ronald has never known his watch to display the wrong time.

An electronic time stamp is generated and displayed on each photo taken by the FBI's camera.  The time stamp on the photo which includes Ronald's watch shows that it was taken at 5:52 a.m.  The time stamp on the first photo taken by the FBI at the time of the search shows that it was taken at 5:15 a.m.

The government disputes that the search took place prior to 6:00 a.m.  In support of this position, Gaztambide executed a declaration and provided oral testimony in court.  Gaztambide claims that she instructed the FBI search team to assemble at 5:15

6

a.m. at the Oakland Resident Agency office, located at 180 Grand Avenue.  After the team assembled, Gaztambide provided coffee and pastries, followed by a briefing on the morning's activities.  180 Grand Avenue is approximately eight miles from Thayer's home. Gaztambide testified that the team left for Thayer's residence at approximately 5:45 a.m.  After about ten to thirteen minutes driving, the team parked their cars about a half mile away from Thayer's house and waited for 6:00 a.m. to arrive.  Gaztambide claims that she contacted the other team members at 6:02 a.m. to instruct them to approach the house and begin the search. Gaztambide's written instructions to the search team corroborate her testimony that she instructed the team to assemble at 180 Grand Avenue at 5:15 a.m.  An FBI form 302 executed by Gaztambide is consistent with Gaztambide's testimony that she instructed the team to approach the house at 6:02 a.m.

Gaztambide disputes the specific claims made in the declarations of Alexander and Ronald.  Gaztambide claims that, according to her recollection, Alexander called his friend immediately after the agents arrived, rather than twenty minutes later, as Alexander claims.  Furthermore, with respect to the time stamp on the photo of Ronald's watch, Gaztambide claims that even though the stamp read 5:52 a.m., the camera's clock was one hour slow because Gaztambide forgot to adjust it for the recent change to daylight savings time.  Thus, Gaztambide concludes that the

7

photo was taken at 6:52 a.m. rather than 5:52 a.m.  Gaztambide also contends that the first photo taken at the search was taken at 6:15 a.m. rather than 5:15 a.m.  Gaztambide admits that she violated FBI protocol by failing to adjust the camera for daylight savings.

The government also offered the testimony of Special Agent Beth Alvarez ("Alvarez").  Alvarez participated in the search of Thayer's home.  Alvarez corroborated Gaztambide's account of the timing of the events leading up to the search, including Gaztambide's claim that she ordered the team to approach Thayer's house at 6:02 a.m.  During the search, Alvarez prepared an administrative log to document the execution of the search.  The administrative log indicates that the search began at 6:00 a.m.  Alvarez testified that even though the search actually began at 6:02, she wrote 6:00 a.m. on the log as a matter of habit.

Finally, the government offered the testimony of another search team member, Intelligence Analyst Ingrid Arbuthnot-Stahl ("Arbuthnot-Stahl").  Arbuthnot-Stahl corroborated Gaztambide's and Alvarez's accounts of the timing of the events leading up to the search.

**B.    Legal Standards**

    **1.    Probable Cause to Issue a Search Warrant**

A United States magistrate judge is authorized to issue a warrant upon receipt of an affidavit which establishes probable cause that a federal crime has been committed.  <u>See</u> Fed. R. Crim.

P. 41(d)(1).  To establish probable cause, an affidavit must establish that there is a "fair probability that contraband or evidence is located in a particular place." United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (citation omitted). "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question." Id.  The opinions and conclusions of an experienced agent are a proper factor in the probable cause determination.  See United States v. Michaelian, 803 F.2d 1042, 1045 (9th Cir. 1986).  Generally, the Court should give great deference to the magistrate's determination. Kelley, 482 F. 3d at 1050.  Doubtful cases should be resolved in favor of a warrant.  Id. at 1050-51.

In addition, "[a]n affidavit must be based on facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." United States v. Lacy, 119 F.3d 742, 745 (9th Cir. 1997) (citation omitted).  The Court must evaluate the staleness of the information in the affidavit "in light of the particular facts of the case and the nature of the criminal activity and property sought." Id. Information is not stale if "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." Id. at 745-46.

**2.   Good Faith Exception to the Requirement of Probable Cause**

Even if a search warrant fails to establish probable cause, evidence obtained pursuant to the warrant remains admissible under the "good faith" exception.  Evidence seized pursuant to a search warrant lacking in probable cause remains admissible if law enforcement officers act in "objective and reasonable reliance" on a warrant issued by a "detached and neutral magistrate."  United States v. Leon, 468 U.S. 897, 926 (1984).

**3.   Franks Hearing**

A party may request a Franks hearing to assess the validity of an affidavit.  An affidavit in support of a search warrant is presumed valid.  See Franks v. Delaware, 438 U.S. 154, 171-72 (1978).  The defendant must establish by a preponderance of the evidence that a false statement, knowingly or intentionally, or with reckless disregard for the truth, was included in the affidavit.  See id. at 156.  In addition to false statements, a defendant may offer proof that the affidavit "contains deliberate or reckless omissions of facts that tend to mislead."  United States v. Stanert, 762 F.2d 775, 781 (9th Cir. 1985).

**II.  DISCUSSION**

**A.   Probable Cause to Search**

Thayer argues that Gaztambide's affidavit failed to establish probable cause that the FBI agents would find child pornography at

10

3533 Mirasol Avenue.  The Court does not agree.  The IP information obtained from AT&T in the Buffalo investigation was sufficient in and of itself to establish probable cause that the FBI would find child pornography at 3533 Mirasol Avenue.  The AT&T IP information directly traced the transmission of child pornography to the computer physically located in Thayer's house.  In his motion, Thayer essentially concedes as much.

Thayer contends, however, that under United States v. Lacy, the AT&T information was stale.  In Lacy, the investigating agent obtained a search warrant based on ten month old information that the suspect possessed child pornography.  119 F.3d at 745.  In the warrant affidavit, the agent opined that "collectors and distributors of child pornography value their sexually explicit materials highly, rarely if ever dispose of such material, and store it for long periods in a secure place, typically in their homes."  Id. at 746 (quotations omitted).  Based on this description, the court held that due to the nature of the crime of child pornography, there was good reason to believe that the child pornographic material would still be present after ten months.  Id.

In Thayer's case, the only distinguishing feature is that the information was approximately two months older than the information in Lacy.  Based on the nature of the crime as described in Gaztabmide's affidavit, as well as the FBI's ability to recover child pornographic materials even after they have been deleted, an

11

**United States District Court**
For the Northern District of California

additional two months is not a sufficient basis to suppress under Lacy.

In a related argument, Thayer contends that in order to rely on one year old information, the government must establish a continuing pattern of criminal activity in order to bolster the old information.  Thayer is correct that establishing a continuing pattern is one way to support an affidavit that contains old information.  See, e.g., id. at 745-46; United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).  Thayer overlooks, however, the alternative basis: "other good reasons."  Lacy, 119 F.3d at 745.  In Lacy, the court specifically held that the nature of child pornography, as described in a search affidavit nearly identical to the instant affidavit, was a sufficient "good reason" to justify the use of ten month old information.  Id. at 746. Under this precedent, there is no basis to conclude that the AT&T IP information was stale.  Accordingly, the Court finds that Gaztambide's affidavit established "a fair probability that contraband or evidence" would be found at Thayer's home.  Kelley, 482 F.3d at 1050.

**B.    Good Faith Exception**

Even if the search warrant did not establish probable cause, Thayer has not demonstrated why the good faith exception should not apply in this case.  To overcome the good faith exception, Thayer contends that the affidavit contained misleading statements

12

intended to deceive the magistrate.  Specifically, Thayer argues that in Gaztambide's affidavit, the agent framed her presentation of the AOL account information in a suggestive manner which created the illusion that Thayer was paying for the AOL account at the time certain offending emails were sent, even though the AOL records did not establish that fact.

Thayer is correct that the AOL records, standing alone, do not establish probable cause that Thayer possessed child pornography at 3533 Mirasol Avenue.  For example, the Philadelphia AOL records were generated on February 1, 2007, nearly one year after the Philadelphia emails were sent, and do not establish that Thayer had any connection with the AOL account at the relevant time.  Moreover, the Buffalo AOL records explicitly state that Thayer had no association with the AOL account whatsoever as of April 25, 2006.  Last, although the Pittsburgh AOL records indicate that Thayer paid for the account, Gaztambide's affidavit did not specify when those records were generated.  Without a date, it was not possible for the magistrate to establish a reliable connection between Thayer and the Pittsburgh emails.

Contrary to Thayer's view, however, these deficiencies do not support any suggestion of bad faith conduct on the part of Gaztambide.  In the affidavit, Gaztambide included all of the information necessary for the magistrate to conclude that the AOL records did not, without more, link Thayer to child pornography.

13

The affidavit: (1) discloses that the Philadelphia AOL records were generated almost one year after the Philadelphia emails were sent; (2) does not disguise the fact that the Buffalo AOL records show Eneida Mendoza, rather than Thayer, as the billing contact; and (3) omits, on its face, any date for the creation of the Pittsburgh AOL records.  Because all of these deficiencies were apparent on the face of the affidavit, there is no basis to attribute any wrongdoing to Gaztambide.  The rationale for the exclusionary rule has always been that it serves to deter police misconduct.  Notwithstanding Thayer's criticism of the agent's writing style, there was no misrepresentation of fact or omission of material information in the affidavit.  There was no police misconduct.  Accordingly, the Court finds that the agents acted in "objective and reasonable reliance" on a warrant issued by a "detached and neutral magistrate."  <u>Leon</u>, 468 U.S. at 926.

**C.    Timing of the Search**

Next, Thayer argues that the evidence obtained from the search should be suppressed because the agents conducted the search outside the time period authorized by the magistrate.  Again, the Court disagrees.

The great weight of the evidence in this case suggests that the search began after 6:00 a.m.  Gaztambide, Alvarez, and Arbuthnot-Stahl all testified that the search team assembled at 5:15, drove to Thayer's house after briefing, waited for

Gaztambide's command, and began the search at 6:02.  As noted, Gaztambide's written instructions confirm that she directed the team to meet at 5:15.  The Court sees no reason why the team would have assembled significantly earlier than the time designated by the search team leader.  Thayer essentially asks the Court to assume that the search team actually assembled at 4:15 a.m. and began their search by at least 5:15 a.m.  This contention is not supported by any witnesses, by any circumstantial evidence, or by any common sense view of the incident.

Moreover, the time stamps on the FBI's photographs are consistent with the time line asserted by the government.  It is true that, on its face, the first picture taken at the search scene would indicate that the search began around 5:15 a.m.  The government has explained, however, that Gaztambide failed to adjust the camera's clock for daylight savings.  Bearing in mind the one hour time difference, the Court finds it reasonable that the team would have begun photographing the scene at 6:15, approximately ten minutes after entering the house.

Thayer has presented evidence to the contrary.  According to Alexander's recollection of the events, for example, the search would have begun at approximately 5:45 a.m.  Alexander's declaration is not inconsistent with the government's time line, however.  Given that approximately a year and a half have passed since the search took place, and given that the search team

15

abruptly roused Alexander in the early hours of the morning, the Court does not find it surprising that Alexander's memory of the timing of the search would be incorrect by fifteen to twenty minutes.

Thayer has also submitted the FBI's photo of Ronald's wristwatch.  This photograph tends to show that the search team had already entered Thayer's home by 6:02 a.m.  This photo is the only circumstantial evidence in the record which is incompatible with the government's version of the events.  Thayer has provided no explanation, however, other than Ronald's claim that his watch is usually correct, why this lone piece of evidence should trump the weight of the evidence submitted by the government.

Perhaps most damaging to Thayer's case is that his evidence conflicts with itself.  For example, as noted, Alexander's declaration suggests that the search began at 5:45 a.m.  According to the time stamp on the earliest photograph, however, which Thayer would have the Court believe is correct, the search began at 5:15 a.m.  Thayer fails to acknowledge that the search cannot have begun at both 5:15 a.m. and 5:45 a.m.  As such, Thayer has failed to present a coherent theory of the timing of the search. Accordingly, despite small problems with the government's case such as: (1) Gaztambide's failure to adjust the camera for daylight savings, and (2) Alvarez's failure to put the correct time on the administrative log, the Court is convinced that the government's

16

time line is the more credible one.  The Court finds that the evidence supports a conclusion that the search began at 6:02 a.m.

Because the Court finds that the search took place after 6:00 a.m., the Court does not reach the question whether suppression would be an appropriate remedy for a search conducted outside the authorized time period.

### III.   CONCLUSION

For the foregoing reasons, the Court hereby DENIES the motion.


IT IS SO ORDERED


Dated: December 2, 2008                    _____
                                           D. Lowell Jensen
                                           United States District Judge

**United States District Court**
For the Northern District of California

17